Estate of Mary Z. Bryan, deceased, Byron E. Bryan, Executor v. Commissioner. Estate of James E. Bryan, deceased, First-Citizens Bank and Trust Company, Executor v. Commissioner.
Estate of Bryan v. Commissioner
Docket Nos. 87900, 87901, 90238, 92504.
United States Tax Court
T.C. Memo 1963-182; 1963 Tax Ct. Memo LEXIS 168; 22 T.C.M. (CCH) 864; T.C.M. (RIA) 63182; June 27, 1963
*168 James and Mary Bryan were equal partners in Bryan Rock and Sand Company, engaged in the quarrying business, prior to James' death in 1953. Under James' will he appointed a bank executor of his estate with directions to pay all obligations and then bequeathed the residue of his estate to the bank, as trustee, to pay the net income therefrom to Mary for life. The will also directed the trustee to become a limited partner with Mary as general partner for the continued operation of the business. The partnership interest comprised by far the largest asset in James' estate. The bank entered into a limited partnership agreement with Mary shortly after James' death as executor and trustee under James' will. Formal administration of James' estate was not completed prior to Mary's death in 1957, nor had all of its obligations been paid at that time. Held: 1. James' estate was the owner of the limited partnership interest throughout the period involved, and was taxable on the limited partner's share of partnership income. Mary was not taxable on any part thereof. 2. The value for estate tax purposes in Mary's estate of her claim against James' estate for undistributed income determined to be *169 the amount agreed upon by the executors of the two estates. 3. Respondent erred in disallowing deductions for costs of labor in opening up the Rawlings and Elm City quarries. 4. Deductibility of expenditures for maintenance, repair, or replacement of equipment determined. (a) For maintenance and repairs during development stage, deductible. (b) For replacements of dippers, dipper sticks, and shovel booms, capitalized. (c) For replacement of air compressor and conveyor equipment damaged in explosion, capitalized. (d) For miscellaneous equipment, capitalized because of lack of evidence. 5. Cost of repair parts purchased and used in 1953 but not billed or paid for until 1957, deductible in 1957. 6. Bryan Rock may not aggregate its 12 quarries for purposes of computing percentage depletion. No proper election filed. 7. Rates of depreciation used by partnership on its returns with respect to its equipment held to be correct. 8. Under the circumstances, partnership not required to reduce its basis for depreciation by salvage value. Stanley Worth, Transportation Bldg., Washington, D.C., and Scott P. Crampton, for the petitioners. Donald W. Geerhart, for the respondent. DRENNEN
Memorandum *170 Findings of Fact and Opinion DRENNEN, Judge: In these consolidated proceedings respondent determined deficiencies as follows: Docket No.
Taxpayer
Tax
Deficiency
87900
Income tax 1955
$140,645.06
Estate of Mary Z. Bryan, De-
Income tax 1956
154,492.03
ceased, Byron E. Bryan, Executor
Income tax 1/1/57 to 7/9/57
127,150.58
87901
Income tax 7/10/57 to 6/30/58
3,207.79
92504
Estate tax
192,669.46 *
90238
Estate of James E. Bryan, De-
FYE 1/31/55
44,004.12
ceased, First-Citizens Bank and
FYE 1/31/56
36,930.56
Trust Company, Executor
FYE 1/31/57
15,188.06
By amended pleadings asserted claims for increased deficiencies in Docket Nos. 87900, 87901, and 90238, and petitioners in each docket number made claims for overpayments of tax, if any, the amounts in each instance to be computed under Rule 50. In Docket No. 92504, petitioner also claimed additional deductions, for estate tax purposes, of the expenses arising out of these proceedings and credit for any additional State inheritance tax that it might be required to pay. The issues for decision are: (1) Whether *171 there is includable in the income of Mary Z. Bryan (hereinafter called Mary) for the calendar years 1955 and 1956 and for the taxable period beginning January 1, 1957, and ending July 9, 1957, the date of Mary's death, all of the income of the estate of James E. Bryan (hereafter called James), consisting almost entirely of the limited partner's 50 percent share of the income of a limited partnership known as Bryan Rock and Sand Company (hereafter called Bryan Rock). (a) If so, whether Mary is entitled to a credit of the income taxes paid by James' estate on this income. (2) The value for estate tax purposes of the item includable in Mary's gross estate representing the amount due her at the date of her death from James' estate. (3) In computing the taxable income of Bryan Rock for its taxable years ending January 31, 1955 and 1956, whether respondent erred in capitalizing the respective amounts of $47,041.42 and $34,937.88 purportedly representing salaries and wages. (4) In computing the taxable income of Bryan Rock for its taxable years ending January 31, 1955, 1956, and 1957, and for its taxable period February 1 to July 31, 1957, whether respondent erred in capitalizing various *172 expenditures with respect to equipment which Bryan Rock had expensed. These items fall into the following general categories: (a) Preoperating or development period expenditures. (b) Replacements of dippers, dipper sticks, and shovel booms. (c) A diesel air compressor and certain conveyor equipment purchased in the taxable year 1955 to replace similar equipment destroyed in an explosion. (d) Repairs or replacements of certain other miscellaneous equipment. (5) Whether Bryan Rock may deduct in its taxable period ending July 31, 1957, the sum of $6,617.59, representing the cost of repair parts purchased and used in 1953 but billed and paid for in 1957. (6) In computing the deductions for percentage depletion for Bryan Rock for the taxable years here involved, whether the noncontiguous quarries of the partnership may be aggregated and considered as one property. (7) In computing the taxable income of Bryan Rock for each of the taxable periods here involved, whether deductions for depreciation are to be determined upon the basis of the useful lives of its equipment used by the partnership in computing depreciation on its returns, and accepted by respondent, or by reference to the higher *173 rates set forth in the construction industry classification for assets in Bulletin F, as now contended by petitioners. (a) Whether respondent erred in setting up salvage values for certain of the depreciable assets of the partnership. Other issues and adjustments to which the parties have agreed or which are dependent upon the decisions of the above issues, or automatic mathematical computations, or expenses incurred in these estate tax proceedings, will be reflected in computations under Rule 50. [1]
General Findings of Fact [2] *174 Some of the facts have been stipulated and are found accordingly. James and Mary were husband and wife residing in North Carolina until James' death on February 5, 1953. James died testate. His will was admitted to probate by the Superior Court of Wake County, North Carolina. The First-Citizens Bank and Trust Company, Raleigh, North Carolina (also of Smithfield, North Carolina, and hereafter called First-Citizens), is the duly qualified and acting executor of his estate. United States fiduciary income tax returns were filed for James' estate for its fiscal years ending January 31, 1955, 1956, and 1957 with the district director of internal revenue at Greensboro, North Carolina. [3]
Mary filed individual Federal income tax returns for the calendar years 1955 and 1956. Mary died testate July 9, 1957. Her will was admitted to probate by the Superior Court of Wake County, North Carolina. Byron E. Bryan is the duly qualified and acting executor of her estate. He filed an individual income tax return for Mary for the period *175 January 1 to July 9, 1957, and he filed a fiduciary income tax return for her estate for the taxable period beginning July 10, 1957, and ending June 30, 1958. He also filed a Federal estate tax return for Mary's estate on or about October 4, 1958. Bryan Rock and Sand Company, Inc., a North Carolina corporation, engaged in the business of quarrying rock, sand, and gravel. As of April 24, 1952, the entire outstanding stock of that corporation was owned in equal shares by James and Mary. Under date of April 24, 1952, James and Mary entered into an agreement to sell the entire capital stock of the corporation to a number of officers and key employees of the company. The latter agreed to purchase the stock in the following proportions: Shares
Luther B. Hughes
1,300
David T. Bailey
1,300
June D. Lane
800
William E. Moore
400
Samuel A. James
400
Colin MacNair
400
Arnold M. Davis
400
Total
5,000
The purchase agreement specified a total purchase price of $3,000,000 for the shares, of which $400,000 was to be paid within 15 days and the balance in equal payments of $260,000 per year for 10 years. The purchasers entered into a partnership agreement dated April 25, 1952, the stated object of which was to provide *176 for the immediate liquidation of the corporation, for the distribution of its assets, and for the conduct of the quarrying business under the partnership name of Bryan Rock and Sand Company. The capital contributions of the partners were in proportion to the shares of stock of the corporation which they had bought from James and Mary. Effective as of April 30, 1952, the liquidation of the corporation was consummated. From May 1, 1952, until December 10, 1952, the business was carried on by the partnership consisting of the seven purchasers. Under date of December 10, 1952, all of the parties to the purchase agreement executed an "Agreement and Release" which provided that the parties desired to rescind and cancel the purchase and sale agreement of April 24, 1952, and that they agreed that the seven purchasers never acquired any interest in the stock of the corporation or in the assets distributed in liquidation; that the seven purchasers were not liable for any corporate obligations; that assets and liabilities of the partnership were to be those of James and Mary; that it was to be deemed that the partnership had been operated for and in the interests of James and Mary; and that the *177 initial payment of $400,000 was to be deemed to have been "a liquidating dividend in kind" to James and Mary as the "actual and beneficial stockholders" of the corporation. Thereafter, but assumed to have been begun as of May 1, 1952, James and Mary, as equal partners, operated the quarrying business under the name "Bryan Rock and Sand Company" until James' death on February 5, 1953. James' will, inter alia, appointed First-Citizens executor of the estate, directed the executor to pay all just debts, including estate taxes, and the costs of last illness and burial, and devised all the remainder of the estate to First-Citizens, in trust, to collect all the income therefrom, and "after payment, or provision for payment, of all costs and expenses properly applicable thereto," to pay the remaining income to Mary during her lifetime. After Mary's death the corpus of the trust and all accumulated income was to be distributed to qualified charities. The will also provided that if, at the time of James' death, any business was being conducted by James and Mary as partners, the business was to be continued as a partnership, with the trustee as a limited partner and Mary as the general partner. *178 Mary was given the discretion to decide how long the limited partnership should continue and at what price and to whom the business might be sold. During the continuance of the limited partnership, the distributive share of the partnership net income which was allocable to the trustee was to be considered income within the meaning of the above provisions. On February 11, 1953, First-Citizens "as Executor and Testamentary Trustee under the will of James E. Bryan," entered into an agreement of limited partnership with Mary which provided for the continuance of the identical business theretofore conducted by James and Mary as equal general partners. The limited partnership agreement contained the following provisions: 1. That the parties hereto hereby form a Limited Partnership, with the said Mary Z. Bryan as the sole General Partner and the said First Citizens Bank & Trust Company, in its fiduciary capacity as Executor and Testamentary Trustee under the will of James E. Bryan, as the sole Limited or Special Partner, under the firm name and style "Bryan Rock & Sand Company." * * *
7. The net profits of the business shall be divided equally between the General Partner and the Special Partner. *179 All distributions of profits between the General Partner and the Special Partner shall be in equal amounts, at such times and in such amounts as the General Partner may determine. Net losses of the business, if any, shall be borne equally. All of the assets which were used in the business of the general partnership were put into the limited partnership on its formation. The limited partnership, with D. T. Bailey (hereinafter referred to as Bailey), formerly vice president of the Bryan corporation and a director of First-Citizens, as its general manager, continued to operate the business successfully until Mary's death on July 9, 1957, and thereafter until July 31, 1957, at which time, pursuant to instructions contained in Mary's will, the business assets were turned over to a corporation formed for the purpose at that time in exchange for its stock and notes. Mary's will also provided that the limited partner receive for its interest in the business nonvoting stock of the corporation equal to the book value of its interest as it appeared on the books of the partnership, and that Mary's executor receive for her interest equal amounts of voting and nonvoting stock of the corporation *180 which in the aggregate equalled the book value of her interest in the partnership as shown on its books. [4] Mary's will bequeathed all the nonvoting stock of the corporation received by her executor to James E. Bryan Foundation, Inc., a charitable corporation formed after James' death, of which Bailey was also executive secretary, and bequeathed all the voting stock of the corporation to three trustees to hold, until the liquidation or sale of the "corporation," in trust for the benefit of her parents and her brothers and sisters, and upon termination to distribute the corpus and accumulated earnings *181 to her brothers and sisters or their estates. Several years after Mary's death the stock of the corporation was sold to an unrelated corporation. The limited partnership maintained its books and computed its income on the accrual method of accounting. It filed partnership information returns, Form 1065, for each of its taxable years ending January 31, 1955, 1956, and 1957, and for the taxable period February 1 to July 31, 1957. On June 4, 1953, Arnold M. Davis (hereafter called Davis) filed a complaint in the Superior Court of Wake County, North Carolina, against First-Citizens and Mary, as "Executors and Trustees of the Estate of James E. Bryan, Deceased," and Mary individually, in which Davis as plaintiff alleged that he became the owner of 400 shares of the capital stock of the Bryan corporation, pursuant to the agreement of purchase and sale dated April 24, 1952; that the corporation was liquidated with the seven purchasers receiving the net assets and operating the business as a partnership; that James thereafter embarked upon a fraudulent scheme to gain possession of the partnership business and that the "Agreement and Release" dated December 10, 1952, which contained false statements, *182 was presented to Davis pursuant to the fraudulent scheme; that he, Davis, signed the agreement under duress and undue influence; and that the assets of the business had been in the wrongful possession of defendants who have been operating the business as partners. Davis asked for an accounting of the business from December 10, 1952, and for the recovery from defendants of a one-eighth [5] interest in the assets of the partnership, including one-eighth of all profits of the business since December 10, 1952. Defendants each retained counsel who were aware that if Davis prevailed in the action, some or all of the other six persons who had agreed to buy the 5,000 shares of stock from James and Mary would probably make claims similar to those made by Davis in the action which he had commenced, and that the entire business might be lost by James' estate and by Mary. The action was tried in the Superior Court of Wake County at the October 1954 civil term. At the conclusion of plaintiff's case defendants moved for dismissal. *183 After argument on the motion, the plaintiff submitted to a judgment of voluntary nonsuit, which was signed on October 20, 1954, and filed in said court on November 8, 1954. During argument on the motion, counsel for the plaintiff stated that he would institute another action within a year, which was the statutory period for commencing an action after a voluntary nonsuit. Defendants' counsel did not regard the judgment of voluntary nonsuit as a final disposition of the action, and they considered the voluntary nonsuit as a tactical maneuver on the part of plaintiff to prepare his case for later presentation of evidence. They so advised defendants during the period within which plaintiff could commence another action. Davis died during this period, but on October 13, 1955, Bryson W. Biggs, an ancillary administrator c.t.a. of Davis' estate, instituted an action against First-Citizens as executor and trustee of James' estate, and against Mary. The grounds set forth in the complaint and recovery sought were the same as those advanced by Davis in the first action. After Mary's death on July 9, 1957, Byron E. Bryan, as executor of her estate, was substituted as party defendant. Bryan's counsel, *184 who was counsel in the prior proceeding, advised his client that in his opinion there was no merit to plaintiff's claim and that there would be no recovery in the action. But he realized the hazards of litigation, and he would not have advised defendants that there was no chance that plaintiff would prevail. The case was tried at the June 1958 civil term of the Superior Court of Wake County. The evidence adduced by plaintiff consisted, in part, of the testimony which Davis had given in the prior action. At the conclusion of plaintiff's evidence a judgment of involuntary nonsuit was entered, from which the plaintiff appealed. The judgment was affirmed by the Supreme Court of North Carolina at the fall term, 1958. The opinion of the court was filed January 28, 1959. Respondent determined a deficiency in income tax against James' estate for the period February 5, 1953, to January 31, 1954, the question involved being whether the limited partnership was entitled to treat its 12 separate quarries as a single property for purposes of computing percentage depletion. A petition for redetermination was filed in this Court by "Estate of James E. Bryan, Deceased, First Citizens Bank and Trust *185 Company, Executor, Petitioner." The issue was decided against petitioner by this Court in an opinion filed June 16, 1960, 34 T.C. 501, and the decision of this Court was affirmed by the Court of Appeals for the Fourth Circuit on May 31, 1961, 290 F. 2d 807. Issue 1. Whether the income of the estate of James E. Bryan is includable in the taxable income of Mary for the year 1955 and 1956 and for the year 1957 up to the date of her death. Findings of Fact In his notice of deficiency in Docket No. 87900 respondent determined that there was includable in Mary's income for each of the years involved the distributable income from the estate of James, computed in accordance with a Schedule A attached. Schedule A computed the amount by starting with the taxable income of the estate per the fiduciary return, which was a net figure considerably less than the limited partner's full share of the partnership income, then adding thereto one-half of the increase in partnership net income as computed on a Schedule B attached. [6] *187 Inasmuch as Mary did not report any income as her distributable share of the income from James' estate, the amount of $109,291.90 (after minor adjustments) was added to her *186 taxable income. On brief, however, respondent claims that at the time the limited partnership agreement was executed a few days after James' death, this amounted to a distribution by the executor of James' interest in the partnership to itself as trustee and that the trustee, not James' estate, became the limited partner, and consequently that the limited partner's entire share of partnership income, presumably without the deductions claimed by the estate, is includable in Mary's income as sole distributee of the entire net income of the trust. In the alternative, respondent argues, continuation of the administration of James' estate beyond the beginning of the period here involved was unnecessary, so the trustee, and thus Mary, is taxable on the entire income of the limited partner. [7] Petitioner claims that the limited partner's interest in the partnership was an asset of the estate throughout the period here involved and that none of the income of the estate was currently distributable because the Davis suit was still pending and because the tax liabilities of the estate had not been settled. James' will appointed First-Citizens executor of his estate and provided that after payment of all debts and taxes all the remainder of his property was given to First-Citizens, as trustee, *188 to pay the net income therefrom to Mary during her lifetime and then to distribute the corpus to charities. The will also provided: (b) In the event that, at the time of my death, any business operations were being conducted by me and my said wife, as partners, I desire that such operations be continued as a partnership, my Trustee hereby appointed being substituted for me as a partner, except that said Trustee shall become a limited partner and not a general partner, my wife thereby becoming the sole general partner, and I hereby so direct my said Trustee. * * * James' one-half interest in the partnership was valued as of the date of his death at $1,823,951.36 for Federal estate tax purposes. This asset represented by far the greatest portion of the probate estate. James also had substantial obligations at the time of his death. On February 11, 1953, First-Citizens, as "Executor and Testamentary Trustee under the will of James E. Bryan," entered into the limited partnership agreement with Mary. All of the assets which were used in the business of the general partnership were put into the limited partnership upon its formation. Neither at its formation nor during its existence did *189 Bryan Rock have liquid assets in excess of those needed in the business. Fifty percent of the taxable income of the limited partnership was credited to the capital accounts of each of the partners each year during its existence, and withdrawals were charged against the respective capital accounts. From time to time from the date of James' death throughout the period here involved, First-Citizens, as executor, asked Bailey, as general manager of Bryan Rock, for funds required to meet the expenses and obligations of the estate. Such amounts were turned over to the executor from partnership funds by Bailey, with the approval of Mary, as they were needed, and were charged to the capital account of the limited partner. Generally the request was for approximately the amount of funds required at the time for payment of debts, costs of administration, and taxes of the estate. First-Citizens, as "executor of and trustee U/W of James E. Bryan, Deceased," submitted annual accountings before the clerk of the Superior Court, Wake County, North Carolina. The first annual account for the period February 11, 1953, to February 11, 1954, showed receipts of principal totaling $416,887.08, including proceeds *190 of sales of miscellaneous personalty in the amount of $12,098.77, an advance from Mary in the amount of $8,857.51, and funds withdrawn from Bryan Rock in the amount of $395,600. Disbursements for the period included $130,854.54 for 1952 North Carolina income tax, $160,978.84 for 1952 Federal income tax, $40,780.48 for 1953 Federal income tax, and payments on a note in the amount of $61,815.65. The second annual account for the period February 11, 1954, to February 11, 1955, reflected receipts of principal in the amount of $417,232.19, of which the amount of $414,300 was withdrawn from Bryan Rock. Disbursements for the period totaled $419,418.87, of which taxes totaled $387,849.72, and of this total, North Carolina inheritance tax amounted to $69,232.56, Federal estate tax to $241,247.41, and 1953 Federal income tax to $44,248.57. Income was in the amount of $45, dividends from First-Citizens. The third annual account for the period February 11, 1955, to February 11, 1956, reflected funds withdrawn from Bryan Rock in the amount of $72,653.35, and disbursements for Federal income tax in the amount of $37,603.55 and for North Carolina inheritance tax in the amount of $12,736.03. The *191 fourth annual account for the period February 11, 1956, to February 11, 1957, showed funds withdrawn from Bryan Rock in the amount of $96,300 and disbursement for Federal income tax in the amount of $80,541.02. Income for the period totaled $51.28. The fifth annual account for the period February 11, 1957, to February 11, 1958, reported funds withdrawn from Bryan Rock in the amount of $108,867.02, and disbursements for current Federal income tax in the amount of $70,079.17 and for additional Federal income tax for 1953 in the amount of $17,970.01. A sixth account was submitted by First-Citizens for the 2-year period February 11, 1958, to February 11, 1960. Each of the foregoing accounts was approved and ordered to be filed in the office of the clerk of the Superior Court. None reported any distributions as such. First-Citizens, during Mary's lifetime, did not set up on its records the trust for which provision had been made in James' will. At the date of the hearing in this proceeding, First-Citizens had not closed out James' estate. It was the practice of First-Citizens, when acting as executor, not to terminate administration of a decedent's estate and set up a testamentary trust *192 until all claims and expenses had been paid by the estate. First-Citizens was advised by counsel that income of the estate could not be distributed during the period of administration, and it was considered during Mary's lifetime that the corpus of the lestamentary trust could not be determined while the estate was in administration and that therefore the distributable net income of the trust could not be computed. First-Citizens, as executor of the estate of James, filed Federal fiduciary income tax returns for each of the taxable years ending January 31, 1955, 1956, and 1957 which reported the following: Taxable year ended Jan. 31 -
1955
1956
1957
Income: Dividends
$ 45.00
$ 61.05
$ 68.90
Income from partnership
98,794.79
109,815.70
128,652.03
Other income (loss)
(606.27)
1.50
Total
98,233.52
109,876.75
128,722.43
Deductions: Interest
3,552.51
818.46
3,120.99
Taxes
27,594.06
10,495.10
9,274.95
Other
11,572.56
8,552.74
8,085.41
Total
42,719.13
19,866.30
20,481.35
Dividend exclusion
$ 45.00
$ 50.00
$ 50.00
Exemption
600.00
600.00
600.00
Taxable income
54,869.39
89,370.45
107,591.08
Net tax (after dividends-received credit)
30,472.04
58,090.74
74,075.30 No deduction for distributions to beneficiaries was claimed on the foregoing returns. *193 On each of the returns First-Citizens reported its title as fiduciary to be "executor." First-Citizens did not file any Federal income tax returns for any of the years here involved as trustee under James' will. Audit and examination of the Federal estate tax return for James' estate was not completed until sometime in 1955. A minor adjustment to the returned valuation of James' partnership interest in Bryan Rock resulted from this examination. In Docket No. 90238 respondent determined deficiencies in income tax against the "Estate of James E. Bryan, Deceased, First Citizens Bank and Trust Company, Executor," for its taxable years ending January 31, 1955, 1956, and 1957. The deficiency resulted from the addition to income of 50 percent of the additional distributable income of Bryan Rock as determined by respondent. At the beginning of the trial and on brief respondent acknowledged that this was a duplication of part of the income charged to Mary and would not be taxable to the estate if this Court sustained his position that the income of the estate was taxable to Mary. Ultimate Findings of Fact The estate of James E. Bryan was the beneficial owner of the limited partner's interest *194 in Bryan Rock during the period here involved and was entitled to 50 percent of the taxable income of the limited partnership. Administration of the estate was not unduly prolonged during the period here involved. Opinion The main thrust of respondent's argument on this issue is that First-Citizens, as executor of James' estate, actually distributed to itself as trustee James' one-half interest in the partnership when it entered into the limited partnership agreement with Mary on February 11, 1953, a few days after James' death, that, as trustee, it became the limited partner and the trust thereafter was the owner of the partnership interest, and that Mary, as sole beneficiary of the trust, was taxable on the limited partner's one-half share of the distributable partnership income. This argument, as does respondent's alternative argument on this issue, recognizes that James' partnership interest was originally an asset of the estate, as indeed we think it was, see Ewing v. Caldwell, 243 N.C. 18, 89 S.E. 2d 774 (1955); Bright v. Williams, 245 N.C. 648, 97 S.E. 2d 247 (1957). This leaves a question of fact whether the estate actually distributed the asset to the trust when the limited *195 partnership agreement was executed. Effie Reed Buckner, 45 B.T.A. 544 (1941). We think the evidence clearly indicates that it did not, and that as a practical matter it could not providently have done so at that time. James' estate, during the period of administration or settlement, is an entity to be recognized for Federal income tax purposes, sec. 641; [8] and if James' estate owned the limited partner's interest in Bryan Rock, then the limited partner's share of the distributable income of Bryan Rock is includable in the income of the estate, and is not deductible by it unless required to be distributed currently or properly paid or credited to the beneficiaries. Sec. 661. James' will appointed First-Citizens both executor and trustee and first directed that the executor pay all obligations of the estate. It next bequeathed the entire residue of the estate to the trustee with instructions that if at the time of his death any business operations were being conducted by James and Mary as partners, such operations be continued as a partnership with the trustee being substituted for James as *196 a limited partner. We find nothing the provisions of the will which would preclude the executor from becoming the limited partner until such time as the obligations of the estate could be liquidated and administration of the estate closed, at which time the interest in the limited partnership would be transferred to the trustee. James' partnership interest constituted by far the largest part of his estate and gave rise to a large part of his estate and inheritance tax liabilities. It would have been impossible for the executor to have liquidated all of the obligations of the estate without borrowing against or selling a part of the partnership interest. James must have been aware of the situation. His principal concern in providing that the trustee should take his place as a limited partner was apparently to assure the continued operation of the business rather than a liquidation of the partnership as would have been the situation under local law had no provision been made in his will for continuation of the partnership. However, he must have known that either partnership assets or partnership income would have to be used by the executor to liquidate the obligations of his estate. *197 Furthermore, it would have been improvident of the executor to distribute this principal asset of the estate before either paying or providing for payment of all of the obligations of the estate, including taxes and costs of administration. Although the will provided for a trust and for the trustee to become the limited partner, the trust did not arise automatically upon the death of the deceased. Such property, like all other parts of the estate, was subject to administration and to the payment of the debts of the deceased. Therefore only when distributed to the trustee would the interest in the partnership become trust corpus. Effie Reed Buckner, supra.We do not think such distribution was made by the executor on February 11, 1953, nor throughout the period here involved. The evidence indicates that First-citizens did not set up the trust on its books and at all times here involved treated the limited partnership interest as an asset of the estate. It did not file fiduciary returns for a trust but did file fiduciary returns as executor of the estate, in which it treated the limited partnership interest as an asset of the estate. It filed annual accountings with the probate court *198 and while it is true that these accounts were filed in its joint capacity as executor and trustee, we do not think that under the circumstances here present this fact had any particular significance. Nor do we think the fact that First-Citizens entered into the partnership agreement as executor and trustee has any significance. We think this was a normal procedure under the circumstances. The estate made the initial capital contribution to the partnership and while it is not entirely clear from the record, it appears that contributions in the form of jointly owned real estate were made to the capital of Bryan Rock after February 11, 1953, which increased the capital account of the limited partner, which was shown to be the estate. We have found as a fact that the estate owned the limited partner's interest in Bryan Rock and that it did not distribute the asset to itself as trustee by executing the agreement with Mary. We note that in the prior income tax case, Estate of James E. Bryan, 34 T.C. 501 (1960), affd. 290 F. 2d 807 (C.A. 4, 1961), which involved the taxable period February 5, 1953, to January 31, 1954, it was stipulated that the executor of James' estate was the limited *199 partner and this Court so found as a finding of fact. This is inconsistent with respondent's present argument that the trustee became the limited partner on February 11, 1953. Respondent's alternative argument on this issue is that the period of administration of James' estate was unduly prolonged and that for tax purposes it is to be deemed ended for the period here in controversy. As we have seen, the estate is to be considered a taxable entity under section 641 "during the period of administration or settlement," but there is no statutory determinant for this period. Section 1.641(b)-3(a), Income Tax Regs., provides as follows: (a) The income of an estate of a deceased person is that which is received by the estate during the period of administration or settlement. The period of administration or settlement is the period actually required by the administrator or executor to perform the ordinary duties of administration, such as the collection of assets and the payment of debts, taxes, legacies, and bequests, whether the period required is longer or shorter than the period specified under the applicable local law for the settlement of estates. For example, where an executor who *200 is also named as trustee under a will fails to obtain his discharge as executor, the period of administration continues only until the duties of administration are complete and he actually assumes his duties as trustee, whether or not pursuant to a court order. However, the period of administration of an estate cannot be unduly prolonged. If the administration of an estate is unreasonably prolonged, the estate is considered terminated for Federal income tax purposes after the expiration of a reasonable period for the performance by the executor of all the duties of administration. Further, an estate will be considered as terminated when all the assets have been distributed except for a reasonable amount which is set aside in good faith for the payment of unascertained or contingent liabilities and expenses (not including a claim by a beneficiary in the capacity of beneficiary). These administrative provisions are similar to those issued under the 1939 Code and have been accepted by this Court. See, e.g., Charlotte Leviton Herbert, 25 T.C. 807 (1956); Sidney N. LeFiell, 19 T.C. 1162 (1953); Joseph M. Roebling, 18 T.C. 788 (1952); Marin Caratan, 14 T.C. 934 (1950); Estate of J. P. Armstrong, 2 T.C. 731 (1943). *201 We must decide, in accordance with these provisions and authorities, whether, as petitioners contend, the period actually required for the executor to perform the ordinary duties pertaining to administration and settlement of James' estate extended through the period under review. That decision calls for a practical view of the record, for the period for settlement of a decedent's estate under State law is not conclusive. [9]Marin Caratan, supra.But the duties imposed on the executor under local law are relevant to the issue. Respondent maintains that the executor of James' estate unreasonably prolonged the period of administration beyond January 31, 1955, and that the period, for income tax purposes, must be deemed terminated as of that date. Petitioners have the burden of proving that the allowable period extended through July 31, 1957. It is undisputed that *202 the estate was in the process of administration beyond July 31, 1957, for other than Federal income tax purposes; that is, the executor had not filed a final accounting, nor been discharged by agreement with the distributees or by virtue of the decree of a local court, nor had it made any formal distributions. The executor's administration continued under the jurisdiction of the local court. Petitioners rely principally on the Davis litigation and the fact that the tax liabilities of the estate had not been settled to justify the continued administration of the estate throughout this period. In our findings are set forth the facts regarding the litigation pursued first by Davis and then by his ancillary administrator. The first action ended in a voluntary nonsuit on November 8, 1954, but, as predicted, the action was renewed within a year. The second action was terminated by a judgment of involuntary nonsuit from which an appeal was taken. The appeal was decided by the Supreme Court of North Carolina at the fall term, 1958, and the judgment was affirmed. The executor of James' estate was named a party defendant in both actions and was represented by counsel. The actions were immediately *203 concerned with 8 percent of assets and profits of the business, but counsel for the defendants were of the opinion that if Davis prevailed other purchasers under the agreement of April 24, 1952, would bring suit. That possibility may have been remote but it was nevertheless a possibility that was taken into account by counsel. The evidence concerning the audit of the Federal estate tax return is scant. The record shows that estate tax in the amount of $241,247.41 was paid with the return, together with interest of $1,206.24, and that an overpayment in tax of $57.19 was refunded before February 11, 1955. The return was marked "received" June 4, 1954. An unexplained deficiency was assessed on or about September 23, 1955, in the amount of $29,354.97, indicating adjustments that would have increased the net estate some $93,487, yet there is no evidence regarding such adjustments. Payment of this deficiency is not reflected in the accountings filed with the clerk of the Superior Court, and presumably the source of the payment was an advance from Bryan Rock. Assuming that petitioners have the burden of proof but recognizing that the evidence concerning audit of the estate tax return is peculiarly *204 within the possession of respondent, in the present state of the record we cannot accept petitioners' argument that audit was not completed until 1956 or respondent's contention that the executor had no reason to believe that the return would not be accepted as filed. So, for present purposes we take it that the estate tax liability was settled by October 1955. However, we conclude that the allowable period for administration and settlement extended through July 31, 1957. The executor was not only engaged in litigation with Davis' administrator at that time but respondent had issued a notice of deficiency in income tax due from the estate for the period February 5, 1953, to January 31, 1954, in the amount of $12,079.87, and the executor filed a petition with this Court which culminated in a hearing and the promulgation of an opinion on June 16, 1960. See 34 T.C. 501. An appeal was taken from the decision which was affirmed by the Court of Appeals for the Fourth Circuit in 1961. See 290 F. 2d 807. The ordinary duties of administration and settlement of a decedent's estate do not include the active and continued conduct of a business, but they do include the determination of liabilities *205 of the estate, and a reasonable period is to be allowed for this function. It is to be noted that the Davis litigation concerned events that occurred during James' lifetime; the plaintiff's actions were based upon James' conduct in the rescission transactions before his death. The executor was no doubt a proper, and in all likelihood a necessary, party to the proceedings, and did not pursue the litigation but had to defend. Indirectly, there was more involved than the amount claimed by the plaintiff. The income tax litigation involved the first taxable period of the estate, concededly within the allowable period of administration, and, again, the executor was a necessary party. Neither litigation arose from transactions of the executor outside the scope of its ordinary duties but were a part of them. Also in this proceeding, Docket No. 90238, respondent has determined a large deficiency in income tax against James' estate. While we recognize that this may be an alternative and protective determination as far as respondent is concerned, it represents a real and serious claim against the estate so far as the executor is concerned, particularly in the light of our conclusion on this *206 issue. The duties of administration and settlement were substantial and the evidence shows that the time reasonably required for their completion extended through July 31, 1957. The executor did not unduly prolong that period. Consequently, the estate was taxable on the limited partner's share of the distributive income of the partnership throughout the period here involved. The evidence indicates that at no time during this period did the estate have any funds in excess of those required to meet its obligations. None of this income was required to be distributed currently nor was any of it properly paid or credited to the trust or to Mary, and it was not taxable to Mary. Sec. 662. See Estate of Peter Anthony Bruner, 3 T.C. 1051 (1944); Martin Raymond Bowen, 34 T.C. 222 (1960), affirmed per curiam 295 F. 2d 816 (C.A. 2, 1961); McCauley v. United States, 193 F. Supp. 938 (E.D. Ark. 1961). Issue 2. Value for estate tax purposes of Mary's claim against the estate of James Bryan. Findings of Fact The estate tax return for Mary's estate filed on or about October 9, 1958, included under miscellaneous property an asset designated "Amount due from the Estate of James E. Bryan for undistributed *207 income due Mary Z. Bryan" with a date of death value of $360,687.71. The value of this asset was computed by the accountants who represented both the estate of James Bryan and the estate of Mary Bryan from the books of Bryan Rock and from the accounts of the executor of James' estate. The item represented the limited partner's 50 percent share of the book net income of the limited partnership from the date of James' death on February 5, 1953, to the date of Mary's death on July 9, 1957, less certain deductions allocated thereto, as follows: Estate's distributive share of part-
nership income: 2/5/53-1/31/54
$190,249.20
FYE 1/31/55
173,738.09
FYE 1/31/56
192,191.88
FYE 1/31/57
221,991.44
Period ended 7/9/57
9,126.55
Total income
787,297.16
Expenses: Farm expenses
928.66
Interest expense
26,438.63
Administrative expense
193.02
Professional fees
19,930.28
N. Car. income tax
42,497.01
Va. income tax
5,052.47
Federal income tax
233,716.04
Other taxes
355.01
Expenses: N. Car. inheritance tax
$ 81,968.59
Va. inheritance tax
5,529.74
Executor's commissions
10,000.00
Total expenses
426,609.45
Net undistributed income:
360,687.71 This figure was agreed to by the executors of both estates and the executor of Mary's estate gave the *208 executor of James' estate a release dated June 30, 1958, of all claims of Mary against James' estate in consideration of payment of the above amount. Under the terms of Mary's will she instructed her executor to incorporate the limited partnership, [10] *209 said corporation to have two classes of stock, voting and nonvoting. For its interest in said business the limited partner was to receive nonvoting stock equal to the book value of its interest as it appeared on the books of the partnership. For her interest in the partnership Mary's executor was to receive equal amounts of voting and nonvoting stock which in the aggregate would equal the book value of her partnership interest as it appeared on the books of the partnership. Mary bequeathed all of the nonvoting stock of the corporation to the James E. Bryan Foundation, Inc., and bequeathed all the voting stock her executor would receive to three trustees, to be held for the benefit of various members of her family. All the rest and residue of her property, with the exception of certain specific bequests, was bequeathed to her surviving brothers and sisters in fee simple. By a tripartite agreement dated July 31, 1957, between First-Citizens, as executor and trustee under the will of James E. Bryan, Byron E. Bryan as executor of the estate of Mary Z. Bryan, and Bryan Rock and Sand Company, a corporation organized under the laws of North Carolina on July 26, 1957 the above provisions of Mary's will with respect to the partnership business were carried out with certain modifications, and this agreement was further modified by a supplemental agreement dated January 6, 1958. These agreements provided that instead of stock alone the newly formed corporation would pay to the two estates for the appraised value of their interests in the net assets of the partnership its notes in a face amount equal to the liabilities of each of the two estates with the balance to be made up to voting and nonvoting stock of the corporation as proposed in Mary's will. These agreements were approved by the Superior Court of Wake County, North Carolina, on the petition of the executor of Mary's estate. Pursuant to said agreements the corporation issued two notes payable to the estate of James E. Bryan, one in the amount of $360,687.71, *210 covering the estate's obligation to Mary, and the other in the amount of $97,557.87, representing the amount of advances made to or for the benefit of James' estate by the partnership. The $360,687.71 note was dated August 1, 1957, but appears to have been made and delivered to the estate sometime in June 1958. This note bore an assignment without recourse from James' estate to the executor of Mary's estate. The assignment was to be effective as of August 1, 1957, and Mary's estate was to receive interest at a stated rate of 5 percent per annum from that date. This note, with the assignment duly executed by the executor of James' estate, was delivered to the executor of Mary's estate who accepted the note in full settlement and satisfaction of all claims of Mary against James' estate. Settlement of this claim for the face amount of the note has not been challenged by any party in interest. In his notice of deficiency of estate tax due from the estate of Mary Z. Bryan, Docket No. 92504, respondent determined that the value of Mary's claim against James' estate was $908,329.22, consisting, with the exception of $280.65 of other income, of the limited partner's 50 percent distributive *211 share of the partnership net income of Bryan Rock as adjusted by respondent. Respondent also determined that no costs and expenses were properly applicable thereto, that none of this amount had been paid to Mary, and that the amount due Mary at the date of her death was the sum of $908,329.22. Opinion The parties argued this issue on entirely different bases although they do appear to agree that the proper starting point for computing Mary's claim against James' estate is the limited partner's share of the net book income of the partnership rather than its net income for tax purposes. Respondent argues the issue on the theory that First-Citizens, as trustee, became the limited partner and was entitled to the limited partner's entire distributive share of the partnership income, all of which was currently distributable to Mary, and that there were no costs or expenses of the trustee applicable to this income, so that the entire gross amount was due Mary at the date of her death. In other words, respondent ignores the estate of James Bryan and claims that the amount determined in the notice of deficiency is an amount due Mary "pursuant to the provisions of the will of James E. Bryan." *212 [11] Respondent has given no explanation how he arrived at the figure of $908,329.22, although it would appear that it represents the limited partner's distributive share of the taxable income of Bryan Rock as determined by respondent in Docket Nos. 87900, 87901, and 90238, with the excess of percentage depletion over cost depletion added back and certain other adjustments being made for capital gains and losses, nontaxable income, and nondeductible expenses. Petitioners argue this issue on the theory that the amount of Mary's claim against James' estate was settled by agreement of the parties and cannot be attacked by respondent *213 who was not a party thereto, and that inasmuch as Mary's estate can never recover from James' estate any more than the amount agreed upon, that was the maximum value of the asset in her estate. Petitioners' evidence does explain that the starting point of $787,297.16 total income in the computation represents the limited partner's share of the partnership net income per its books and that the expenses charged thereto were taken from the accounts of the executor of James' estate. Inasmuch as we have decided under Issue 1 above that First-Citizens, as executor of James' estate rather than as trustee under the will, was the owner of the limited partnership interest throughout the period here involved, and that the estate was taxable on the limited partner's distributive share of the partnership income, respondent's argument must fail and, consequently, respondent's determination on this issue carries with it no presumption of correctness. Helvering v. Taylor, 293 U.S. 507 (1935). The only evidence upon which we can decide this issue is petitioners' evidence that the accounting between the two estates was prepared by the accountants from records kept by them throughout the period here *214 involved, that the accountants relied on their own experience and the advice of the executor and attorneys for James' estate as to what expenses were properly chargeable against income, that the executors of the two estates accepted this computation and settled the claim on the basis thereof, and that in the opinion of the attorneys and the accountants the computation was fair and correct. It also appears that the executor of Mary's estate obtained the approval of the probate court before entering into the settlement agreement, that the settlement has never been attacked, and that the amount thereof is the only amount Mary's estate will ever receive from James' estate as a result of this claim. Respondent makes no claim of collusion in arriving at the settlement figure and we find no evidence thereof. We also recognize that Mary's brothers and sisters, as residuary beneficiaries of her estate, would stand to gain from any increase in the amount of this claim and their interests would be adverse to that of the charitable foundation which was the ultimate beneficiary of James' estate. We recognize further that in the absence of evidence to the contrary the two fiduciaries will be presumed *215 to have been acting in good faith in agreeing to the settlement. We realize that the agreement between the two executors is not conclusive upon the question of value, see Angela Fiorito, 33 T.C. 440 (1959), but under the circumstances here present we feel bound to accept it as the value of this asset in Mary's estate for estate tax purposes. See Freuler v. Helvering, 291 U.S. 35 (1934); Estate of Arthur H. Hull, 38 T.C. 512 (1962), on appeal (C.A. 3, Feb. 21, 1963). While some of the expenses charged against the income by the accountants in the settlement computation may have been applicable to corpus rather than income, neither party has made any effort to analyze these expenditures and we do not feel that we have any basis in this record on which to question the judgment of the parties in allocating those expenses. We conclude that the value of Mary's claim against the estate of James E. Bryan at the time of Mary's death was $360,687.71. Issue 3. Whether respondent erred in capitalizing the amounts of $47,041.42 and $34,937.88 for Bryan Rock's taxable years 1955 and 1956, respectively, purportedly representing salaries and wages. This and the following issues are all concerned *216 with adjustments made to the taxable income of Bryan Rock during the years here involved. Findings of Fact In his notice of deficiency respondent added to taxable income of the partnership for the fiscal years 1955 and 1956 the respective amounts of $47,041.42 and $34,937.88, on the theory that these adjustments represented labor costs which had been deducted as expenses in connection with the opening and operation of the Rawlings and Elm City quarries of Bryan Rock, respectively, whereas such amounts should have been capitalized. The amounts of said adjustments were arrived at by respondent as follows: An appraisal of the partnership properties as of August 1, 1957, made by an expert employed by petitioners for the purpose of ascertaining the fair market value of Mary's interest in the limited partnership at the time of her death and used by petitioners in evaluating that interest in Mary's estate for estate tax purposes, set forth, as to the assets of each separate quarry, the cost of reproduction, broken down between materials and labor. The estimated cost of labor in the appraisal exceeded the actual cost of labor which had been capitalized on the partnership's books in the case *217 of the Rawlings quarry by $47,041.42, [12] and in the case of the Elm City quarry by $34,937.88. Labor costs capitalized and expensed on the partnership books for the Rawlings quarry for 1955 were $15,128.58 and $12,322.12, respectively; and for the Elm City quarry for 1956 were $14,682.12 and $18,980.41, respectively. [13]
The partnership maintained payroll records for each of its quarries showing the number of hours worked by each man each day. These records were kept by the cashier at the partnership's home office. Charges for labor from the payroll records were made to the several accounts which were maintained for each quarry and were allocated as to expense or capital expenditure. The allocation from the payroll to the various accounts was made by the superintendent of the respective quarries in conjunction with the cashier and the notations for allocation as to type and place of each man's work were signed by both *218 the superintendent of the quarry where the workers were usually stationed and the cashier. When the partnership opened the Rawlings quarry and the Elm City quarry men normally assigned to other quarries were used temporarily to some extent at the Rawlings and Elm City quarries, and some of the labor required to repair equipment for use at the latter two quarries was performed at the Rolesville quarry. In such cases while the cost of labor appeared on the payroll record of the quarry to which these men were normally assigned, the costs thereof were allocated to the quarry for which the work was performed. The appraisal referred to above, made by E. Lee Heidenreich, Jr., a consulting engineer, appraised the assets at each quarry at market value as of August 1, 1957. He considered each asset on the property at that time and the estimated labor costs which would be required for installation of the asset and, to arrive at present value, he depreciated the total reproduction cost, including labor. The appraisal did not purport to have any direct relationship to original cost and did not take into consideration whether the labor might have been performed by the partnership's own employees *219 or by outside labor. Opinion Respondent's determination with respect to this issue and his argument in support thereof is based on the theory that inasmuch as the cost of labor for reproducing the Rawlings and Elm City quarries as shown in the appraisal exceeded the cost of labor capitalized on the partnership's books for those two quarries by the amounts of $47,041.42 and $34,937.88, respectively, the partnership must have improperly expensed that amount of labor at either the Rawlings and Elm City quarries or at some other quarries, which should have been capitalized. The Heidenreich appraisal was based upon estimates, as of August 1, 1957, of the labor costs as of that date of installing the machinery and equipment which was then in place at the two quarries. It had little, if anything, to do with either actual or estimated original labor costs. Thus, even if it be assumed that the machinery, equipment, and buildings which were located at those quarries in mid-1957 were all placed at Rawlings in the taxable year 1955 and at Elm City in the taxable year 1956, there would be convincing support for the argument that respondent's determination on this issue was arbitrary, in that it *220 has been shown to lack factual foundation, and that it is not to be accorded the usual presumption of correctness. Helvering v. Taylor, supra.But the evidence of record is convincing that an allocation of labor charges to quarries was made by the superintendent on each job and by the cashier at the home office and that allocations were also made as between expenses and capital expenditures by the superintendents in the field who were skilled in this work. Even if a crew from one quarry did work at another, the charge would be to the accounts of the quarry where the work was performed, not the home quarry of the crew. And if machinery was sent from a quarry to Rolesville to be repaired, where facilities were better than at other quarries, the labor costs were charged to the quarry from which the equipment came. The allocations were made in the course of maintaining the primary records of the partnership on a daily basis and we find no reason not to accept them. We hold for petitioners on this issue. Issue 4. Whether respondent erred in in capitalizing various expenditures with respect to equipment which the partnership expensed. Respondent originally determined that the amount of *221 $183,859.73 deducted by the partnership for repairs over the period here involved should have been capitalized; by amended answer respondent asserts that additional items in the amount of $43,286.12 should also be capitalized. This broad issue involves four different classifications of items as follows: (a) Preoperating or development expenses Findings of Fact Bryan Rock developed the Rawlings quarry in its fiscal year ending January 31, 1955, and the Elm City quarry in its fiscal year ending January 31, 1956. The Rawlings quarry was developed on pasture land. The property first had to be core drilled to determine if marketable stone underlay the property, and the partnership spent $2,000 for this purpose. Thereafter trees had to be removed and the rock stripped of its overburden, including dirt and a layer of sap rock, before usable stone could be quarried. There were no sales from the Rawlings quarry in 1955. Elm City had been operated as a quarry many years previously, but water had to be pumped out of the quarry before the partnership could bring the quarry to the production stage. The partnership incurred expenses in bringing both of these quarries to the production stage, some *222 of which costs it originally capitalized and the balance of which it expensed. The accountants in auditing the partnership books analyzed the various expenditures and removed some of the items that had been capitalized from the capital accounts and placed them, together with the other expensed items, in either a development or a preoperating expense account. Bryan Rock claimed the following expenditures as expenses of developing the Rawlings quarry in 1955, which respondent determined should be capitalized in his notice of deficiency: Drill parts
$13,211.50
Truck parts
10,545.80
Crusher
13,990.63
Screening
663.60
Total
38,411.53
Bryan Rock also claimed the following amounts as expenses incurred in developing Elm City quarry in 1956, which respondent determined should be capitalized: Wages
[1] $ 9,435.90
Power
1,898.27
Explosives
789.50
Drill parts
1,347.58
Drill steel
453.20
Parts for shovels and cranes
1,519.32
Truck parts
196.50
Crusher
$ 3,456.00
Miscellaneous repairs and
supplies
6,533.55
Rent
126.42
Total
$25,756.24
The foregoing amounts, if incurred in operating the quarries after they reached the production stage, would be deductible expenses, *223 primarily as ordinary and necessary repairs. The amounts were expenditures for development of the quarry and were paid or incurred after it had been determined that stone in commercially marketable quantities could be quarried. Opinion Respondent argues that the above expenditures, while admittedly deductible as repairs if incurred and paid after the quarries reached the production stage, having been incurred prior to the production stage, are a part of the overall capital investment in the quarries and must be capitalized. Respondent relies on the legal principles enunciated in Jones v. Commissioner, 242 F. 2d 616 (C.A. 5, 1957), affirming 24 T.C. 563 (1955); Bloomfield Steamship Co., 33 T.C. 75 (1959), affirmed per curiam 285 F. 2d 431 (C.A. 5, 1961), and similar cases, that particular expenditures while standing alone or made as periodic repairs might be deductible, if made as a part of the entire capital investment in property being improved must be treated as capital expenditure. Petitioners claim that these expenditures were ordinary repairs incurred in the development stage of the quarries which they elected to deduct under section 616(a) of the Code. [14] Petitioners have *224 the burden of proof on this issue. Respondent concedes that the amounts in question were incurred prior to the time the two quarries reached the production stage and that had the expenditures been made in the ordinary course of operating the quarries, they would be currently deductible as ordinary and necessary repairs. We have found that the expenditures were incurred after it had been determined that the stone in marketable quantities underlay the premises. The question thus framed is whether *225 amounts spent for repairs or repair parts which would ordinarily be deductible if incurred in the production stage are to be capitalized if made for repairs to machinery and equipment used in developing the quarry. We hold that such expenditures are currently deductible under section 616(a). Prior to the enactment of section 309 of the Revenue Act of 1951 (sec. 23(cc), I.R.C. 1939, the predecessor provision of sec. 616), expenditures for the development of mineral deposits, in excess of the net receipts from the sales of the mineral, made before the production stage was reached, were chargeable to capital accounts to be recovered through depletion. See sec. 29.23(m)-15, Regs. 111; Clear Fork Coal Company v. Commissioner, 229 F. 2d 638 (C.A. 6, 1956), reversing 22 T.C. 1075 (1954); Alsted Coal Co. v. Yoke, 200 F. 2d 766 (C.A. 4, 1952); Guanacevi Mining Co. v. Commissioner, 127 F. 2d 49 (C.A. 9, 1942), affirming 43 B.T.A. 517 (1941). Section 309 appears to have been enacted for the precise purpose of permitting a taxpayer to claim as deductions such development expenditures which had not previously been allowed. See S. Rept. No. 781, 82d Cong., 1st Sess., pp. 44-45 (1951), 1951-2 C.B. 458, 489-490, *226 in which it is said in part: It is believed that the expenditures for the development of a mine - those incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed - are essentially similar to those incurred after the production stage has been reached, and, like those, should be treated as expenses relating to the production of the ore or minerals. Respondent argues that the expenditures here involved were for the acquisition and improvement of depreciable property and, as such, are specifically excluded from the coverage of section 616(a). We do not agree. The evidence indicates that Bryan Rock did purchase several used trucks for use in the Rawlings quarry and a used tractor, costing $200, for use in the Elm City quarry but it also shows that most of the equipment used in these quarries was either new or transferred from another quarry. We assume that the used equipment purchased by Bryan Rock was in serviceable condition when it was acquired. It is not likely that any appreciable part of the expenditures here involved could have been incurred in a major program of rebuilding or restoring the equipment used in these two quarries. We are *227 convinced that the expenditures were incurred in the day-to-day repairs of this equipment either when it was transferred to the two quarries or during the development stage of the quarry. Were this not so we doubt that respondent would agree that these expenditures would have been deductible as necessary repairs had they been incurred after the quarries became productive. Respondent also argues that petitioners have not demonstrated that the amounts disallowed were development expenses and that the case therefore is not to be governed by section 616(a). Respondent calls attention to the amounts spent for screening which, he claims, could be used only in production and not development; but, as we have noted, respondent concedes that if these expenditures were incurred in the production stage they would be deductible. We have also found that the expenditures were incurred after the exploratory stage had been passed and before the production stage had been reached. It follows that they must have been incurred during the development stage and hence section 616(a) is applicable. We hold for petitioner on this issue. (b) Replacement of dippers, dipper sticks, and shovel booms Findings of *228 Fact Bryan Rock used large shovels in its quarrying operations. These shovels consisted basically of a tractor body and power unit, a cab, a boom, a dipper stick, and a dipper or bucket. The boom extended from the body and was connected to the roof of the cab by guy wires. The dipper stick was a steel bar attached to the boom. At one end of the stick was the dipper and at the other end were wires and a pulley by which the stick and dipper could be raised and lowered. A dipper, being in direct contact with the stone, is subject to unusual wear. An extra piece of steel was welded on the dipper before it was placed in operation and this piece was built up during operations. After a certain point the metal crystallized and could no longer be welded. Both dippers and dipper sticks were subject to hard wear and stress from side movements and from occasional rock slides. Bryan Rock followed the policy of expensing dippers and dipper sticks. It did not maintain an inventory of them and sometimes bought dippers from suppliers who did not sell shovels. Dippers are manufactured by manufacturers who do not sell the shovels on which the dippers are to be used. The partnership had 12-15 shovels *229 during the period under review. During the same period it purchased 13 extra dippers and 1 or 2 booms. Dippers are manufactured from carbon steel but the teeth are made from manganese steel in order to extend their useful life which, with proper maintenance, can be expected to be up to 2 years under hard usage in the type of stone quarried by Bryan Rock, with the shovels in operation for a 10-12-hour day in summer and a shorter day in winter. The partnership had to purchase a boom for a shovel at the Neverson quarry in the taxable year 1956 because of an accident caused by the carelessness of the shovel operator. In Bryan Rock's operations, amounts incurred for dippers, dipper sticks, and shovel booms were capital expenditures. The useful life of a dipper was 2 years; scrap value was nominal at the end of the useful life since the steel could no longer be welded. The dipper sticks and booms were integral parts of shovels, and their useful lives were the same as the useful life of a shovel. Opinion Although we have no authority for the proposition, we have little trouble in finding that the expenditures for booms and dipper sticks were capital expenditures. The booms were admittedly *230 rarely replaced. The evidence touches on only one which had to be replaced, and that was because a driver attempted to push rock with the boom at the Neverson quarry. It is not clear from the evidence whether the cost of the second boom in the amount of $4,450, added by respondent's amended answer, was actually a second boom or was a part of the cost of the boom replaced at the Neverson quarry. However, there is no question that this expenditure was in connection with a boom and it would fall in the same category as the expenditure for a boom about which we do have some evidence. While the dipper sticks are subjected to rougher treatment than the booms, we think it is clear from the evidence that their normal lives would be considerably in excess of 1 year. We believe the evidence shows affirmatively that booms and dipper sticks are integral parts of power shovels and that their addition prolongs the life of a shovel as a shovel and adds to its value. The cost of dippers presents a more difficult question. Dippers were subjected to extremely hard use and wear. It does not appear that Bryan Rock ever bought a shovel without a dipper, but it does appear that the dippers were often removed *231 from a shovel and were reinforced, repaired or replaced as separate items, and were not integral parts of a shovel. Replacement dippers were often purchased from manufacturers other than the manufacturers of the shovel for which it was used. Yet a dipper, even with hard usage, could be expected to have a useful life in excess of 1 year, and it was a substantial item. With hard use and good maintenance a dipper had a useful life of 2 years to Bryan Rock. Ordinarily an item of equipment having a useful life in excess of 1 year is classified as a capital item; sec. 1.263(a)-1(a), Income Tax Regs; Journal-Tribune Publishing Co., 38 T.C. 733 (1962), on appeal (C.A. 8, Dec. 21, 1962); Estate of C. L. Hayne, 22 T.C. 113 (1954). The fact that 13 dippers were bought over the 4-year period here involved is some indication that the useful life exceeded 2 years, but based on testimony of an experienced witness from the industry, we accept the 2-year life for Bryan Rock. While the question is close, particularly in view of some evidence that the custom in the industry is to expense dippers, we believe the dippers here involved were replacements of capital items which should be capitalized and *232 depreciated or charged against the depreciation reserve. We hold for respondent on this part of this issue, except that the cost of dippers to be capitalized in the year 1957 should be $11,551.36 rather than $13,101.36 as alleged. [15]
(c) The cost of a diesel air compressor and certain conveyor equipment purchased in 1955 to replace similar equipment destroyed in an explosion. Findings of Fact A diesel air compressor and certain conveyor equipment used by Bryan Rock at its Crabtree quarry was severely damaged in a wall-shot explosion due to faulty powder. Bryan Rock purchased the equipment here involved to replace the damaged equipment at a total cost of $22,425.82. Bryan Rock received from Hercules Powder Company the sum of $22,500 on account of the explosion which it credited to expense when received. Bryan Rock deducted the cost of the new equipment as a business expense. Respondent disallowed the deduction in 1955 but made no adjustment for the amount credited by Bryan Rock to expense. Opinion Exhibit A attached to respondent's notice of deficiency reflects respondent's computation of the corrected income of the partnership for the years *233 involved. Item 2 of the adjustments made was a disallowance of deductions for repair parts, supplies, and miscellaneous expenses. The explanation of this adjustment was that the deductions claimed were disallowed because they correctly represent capital expenditures. The detail of the deeuctions disallowed for the period ended January 31, 1955, includes a diesel air compressor in the amount of $6,865.41 and conveyor materials in the amount of $15,560.41. Petitioners in their petitions claimed as error respondent's disallowance of these deductions and alleged that all of the items listed under item 2 in Exhibit A to the notice of deficiency were properly charged to expense as true repair parts and that no portion thereof constituted a capital expenditure. This framed the issue so far as the pleadings are concerned. At the trial and over respondent's objections, petitioners introduced evidence to show that the expenditures for a diesel air compressor and conveyor materials, referred to above, had been made to replace a diesel air compressor and conveyor materials destroyed by an explosion at its Crabtree quarry in 1955 and that subsequent thereto the partnership had received $22,500 *234 from Hercules Powder Company as payment for part of the damage done by the explosion, which was credited to expense when received. While petitioners' accountant testified that this credit to expense offset the deduction for the cost of the new air compressor and conveyor materials, we have no evidence showing when the $22,500 was received, what year it was credited to expense, whether the destroyed equipment had any remaining basis and, if so, the amount thereof, or whether a loss was claimed as a result of the destruction of the old equipment. On brief, petitioners claim that inasmuch as the recovery from Hercules Powder Company was credited to expense, the partnership was justified in treating the expenditure for the replacement equipment either as an expense under section 162(a), or as a casualty loss in the year of explosion under section 165(a), or as an involuntary conversion and replacement of like property under section 1033(a). While we recognize that in all likelihood there should have been some additional adjustment to the partnership's reported income if the cost of the replacements must be capitalized, [16] nevertheless, the latter two arguments were raised for the first *235 time on brief and this Court has often held that it will not consider issues raised for the first time on brief. Eleanor C. Shomaker, 38 T.C. 192 (1962). Furthermore, we do not have sufficient evidence to know how the recovery item should have been treated even if that issue were properly before us. Therefore, the only issue before us is whether the expenditure for the replacement equipment was properly expensed or should be capitalized. The burden of proof on this issue is on petitioners. Petitioners agree on brief that these items would normally be capital expenditures but argue that under the circumstances here present they were properly deducted as expenditures for repairs. The line between what expenditures may be deducted and what expenditures must be capitalized for repair and/or replacement of damaged business property is often hard to draw. Usually, however, if the expenditure is for the replacement of property damaged or destroyed, rather than for the repair of *236 the damaged property, the replacement, if it is a capital item, as here, must be capitalized and the loss on the damaged equipment claimed as an expense. Hubinger v. Commissioner, 36 F. 2d 724 (C.A. 2, 1929), affirming 13 B.T.A. 960 (1928); Buffalo Union Furnace Co. v. Helvering, 72 F. 2d 399 (C.A. 2, 1934). The only evidence we have indicates that these expenditures were for replacements of capital items; consequently, the cost thereof should be capitalized. We hold for respondent on this part of this issue. (d) Repairs and replacements of other miscellaneous equipment. Other items capitalized by respondent in his determination of the deficiencies herein are sustained in the absence of material evidence with respect thereto. Issue 5. Whether Bryan Rock may deduct in its taxable period ending July 31, 1957, the sum of $6,617.59, representing the cost of repair parts purchased and used in April 1953 but billed and paid for in 1957. Findings of Fact In April 1953 it was necessary to repair and replace a number of worn out parts on a dragline crane being operated by the partnership at its Linden quarry. The employees of the partnership did the actual repair work and in doing so *237 ordered approximately 150 separate repair parts from J. B. Hunt & Sons, Inc., of Raleigh, North Carolina. The parts were delivered and used by Bryan Rock almost immediately but no invoice for the parts was received by Bryan Rock until April 5, 1957. On receipt of the invoice it was referred to the manager of the Linden quarry for verification and his comments. The manager replied that the crane had in fact been overhauled and that the parts had been used and the invoice should be paid. The partnership thereupon paid the invoice and accrued the item on its books as of July 22, 1957. As a usual practice, amounts were accrued when the partnership was billed for them and after the personnel in the home office had had an opportunity to check the bill. The partnership personnel were familiar with the costs of such parts and could have ascertained the amount of this bill by telephoning the supplier. However, the home office personnel had no occasion to do this in 1953 because the matter had not been brought to their attention. The reason given by the supplier for the late billing was that defalcation by an employee had led to the delay. This was an unusual incident in the partnership's usual *238 accounting and occurred only because of the oversight of the supplier in sending an invoice promptly. Respondent recognizes that the expenditure was for items that should be expensed but determined that the amount of this item was properly accruable in the partnership's fiscal year ending January 31, 1954, and disallowed the deduction for the partnership's taxable period ending July 31, 1957. Opinion There is no question that this expenditure should have been accrued in the fiscal year 1954 had it been brought to the attention of the partnership's bookkeeper. However such was not the case and as a practical matter in an operation of this size it could not be expected that the bookkeeper would pick up this item until an invoice was received therefor. There is no evidence that any employee of the partnership actually knew the cost of the parts ordered and used until the invoice was received in 1957. We therefore conclude that this item was properly deductible by the partnership as an expense in its taxable period ending July 31, 1957. Issue 6. Percentage depletion. This issue is whether the partnership was entitled to aggregate all of its quarries under section 614(b), for purposes *239 of computing percentage depletion or must compute depletion for each separate quarry. Findings of Fact During the period here involved petitioner owned or had an interest in 12 separate quarries, all but 1 of which it operated. It did not operate the Greystone quarry but merely furnished the land and equipment to a lessee, and received royalties therefrom. During the taxable periods here involved the partnership realized the following receipts from sales (and royalties) as shown by summaries from its books for its quarries: Taxable year ended
Quarry
1955
1956
1957
7/31/57
Garysburg
$ 308,023.01
$ 291,749.88
$ 230,124.61
$ 146,689.72
Rolesville
1,094,212.14
893,671.30
848,571.66
205,783.05
Goldsboro
30,672.48
55,349.45
127,211.12
20,029.01
Puddledock
276,503.20
272,482.14
325,954.53
208,760.23
Aberdeen
35,861.96
50,143.41
51,740.23
26,262.05
Linden
124,434.31
92,731.79
51,459.10
27,044.61
West End
11,867.05
14,854.75
16,608.13
7,487.56
Crabtree
302,577.37
376,907.77
372,691.77
196,388.89
Neverson
1,271,706.51
1,466,304.30
1,421,951.46
635,440.45
Rawlings
189,809.81
366,122.71
265,252.74
Elm City
48,947.58
341,274.11
183,631.43
[1] *240 Greystone 136,905.24
79,267.13
71,994.18
51,771.90
$3,592,763.27
$3,832,219.31
$4,225,373.61
$1,974,541.64
The quarries were widely separated geographically, and no two were contiguous. Two of the quarries were located in Virginia and the others were in North Carolina. The straight-line distance from the northernmost, Puddledock, to the southernmost, Aberdeen, is about 185 miles. Each quarry had its own superintendent, its own work crews, its own equipment, its separate repair crews, and its own monthly payroll records, except that Puddledock and Rawlings shared the same labor crews. However, the main office of the partnership was located in Raleigh where the general management and general records of the company were located. There was at least some shifting of crews and equipment between quarries. [17] *241 In computing percentage depletion on the tax returns filed for the partnership for each of the periods here involved the gross income from all the quarries, including Greystone, were included in one lump sum. On each return the computation of percentage depletion reported only one sum as gross income from mining. Nowhere on any of the returns does it appear that the partnership operated more than one quarry or was electing to aggregate its properties. No written election to aggregate the quarries for percentage depletion purposes was filed by the partnership or the partners; nor was any of the information required by respondent's interim and final regulations pertaining to making the election submitted. In his notices of deficiency respondent did not adjust the partnership's computation of percentage depletion. Opinion This issue was raised for the first time by respondent by amended answer filed when this case was called for trial - hence the burden of proof is on respondent. However, there is no dispute over the facts with respect to the filing of an election and inasmuch as we think this issue must be decided *242 on that point we need not decide whether respondent has carried his burden of proof with respect to the basic question of whether these properties are all separate operating units which could not be aggregated even if a valid election had been made. We do point out, however, that this Court specifically held, in Estate of James E. Bryan, supra, decided June 16, 1960, that each of these quarries were separate properties for depletion purposes under the 1939 Code. [18]
Section 614 provides in material part as follows: SEC. 614. DEFINITION OF PROPERTY. (a) General Rule. - For the purpose of computing the depletion allowance in the case of mines, wells, and other natural deposits, the term "property" means each separate interest owned by the taxpayer in each mineral deposit in each separate tract or parcel of land. (b) Special Rule as to Operating Mineral Interests. - (1) Election to aggregate separate interests. - If a taxpayer owns two or more separate operating mineral interests which constitute part or all *243 of an operating unit, he may elect (for all purposes of this subtitle) - (A) to form one aggregation of, and to treat as one property, any two or more of such interests; and (B) to treat as a separate property each such interest which he does not elect to include within the aggregation referred to in subparagraph (A). For purposes of the preceding sentence, separate operating mineral interests which constitute part or all of an operating unit may be aggregated whether or not they are included in a single tract or parcel of land and whether or not they are included in contiguous tracts or parcels. A taxpayer may not elect to form more than one aggregation of operating mineral interests within any one operating unit. (2) Manner and scope of election. - The election provided by paragraph (1) shall be made, for each operating mineral interest in accordance with regulations prescribed by the Secretary or his delegate, not later than the time prescribed by law for filing the return (including extensions thereof) for whichever of the following taxable years is the later: The first taxable year beginning after December 31, 1953, or the first taxable year in which any expenditure for exploration, *244 development, or operation in respect of the separate operating mineral interest is made by the taxpayer after the acquisition of such interest. Such an election shall be binding upon the taxpayer for all subsequent taxable years, except that the Secretary or his delegate may consent to a different treatment of the interest with respect to which the election has been made. (3) Operating mineral interests defined. - For purposes of this subsection, the term "operating mineral interest" includes only an interest in respect of which the costs of production of the mineral are required to be taken into account by the taxpayer for purposes of computing the 50 percent limitation provided for in section 613, or would be so required if the mine, well, or other natural deposit were in the production stage. The foregoing statutory provision was new in the Code of 1954. Pursuant to this statutory provision, regulations were to prescribe the method by which a taxpayer can elect to aggregate separate properties. Section 1.614-2(d), Income Tax Regs., sets forth in detail how this election is to be made. Basically, the taxpayer is to make the election by attaching to his income tax return a statement *245 for the first taxable year for which the election is made, indicating that he is making an aggregation of separate operating mineral interests within an operating unit, and filing supporting data from which it can be determined whether a proper election has been made. There was filed with the returns for Bryan Rock no statement which, in our opinion, could under any view be taken as an election by the taxpayer. We cannot agree with petitioners that merely filing a return computing the percentage depletion deduction on the basis of one amount of gross income and one amount of net income subject to depletion amounted to an affirmative election to aggregate under the provisions of section 614. Section 614 provides specifically that an election shall be made for each operating mineral interest, not later than the time prescribed by law for filing the return for the first taxable year beginning after December 31, 1953, in accordance with regulations prescribed by the Secretary or his delegate, and the election, once made, becomes binding for all subsequent years. This was an entirely new privilege granted taxpayers under the 1954 Code but there is nothing on the returns filed by the partnership *246 to indicate it was doing anything different than it had done on prior years' returns. Petitioners argue that respondent's agent examined the partnership books and respondent must have been aware that the partnership was aggregating its quarries for depletion purposes, and therefore when respondent did not disturb the depletion computation in his notice of deficiency, he was accepting the returns as constituting a proper election and waived the necessity of filing a specific election. In the first place, we are doubtful that respondent could waive the requirement of the statute that an election be made at the time of filing the first return after 1953. See Angelus Milling Co. v. Commissioner, 325 U.S. 293 (1945). Furthermore, we think the language of the Supreme Court in the Angelus Milling Co. case is particularly apropos and disposes of this argument. The Court said, at page 297: The showing should be unmistakable that the Commissioner has in fact seen fit to dispense with his formal requirements and to examine the merits of the claim. It is not enough that in some roundabout way the facts supporting the claim may have reached him. The Commissioner's attention should have been focused *247 on the merits of the particular dispute. * * * and at page 299: But it is not enough that somewhere under the Commissioner's roof is the information which might enable him to pass on a claim for refund. The protection of the revenue authorizes the Commissioner to demand information in a particular form, and he is entitled to insist that the form be observed so as to advise him expeditiously and accurately of the true nature of the claim. Petitioners' reliance on Landy Towel & Linen Service, Inc., 38 T.C. 296 (1962), affirmed per curiam 317 F. 2d 362 (C.A. 3, May 23, 1963), is misplaced. There the law provided that the filing of a consolidated return constituted an election and consent thereto. And respondent's acceptance of the election was quite different there than the situation here where respondent was not even put on notice that an election was being made. Petitioners also argue that because respondent had not issued his final regulations, at the time these returns were filed, he should not complain of the taxpayers' interpretation of the law, citing Sayre v. United States, 163 F. Supp. 495 (S.D.W. Va. 1958). We are not concerned here with an interpretation of the law, but *248 only with whether the partnership did, or even intended to, file the election required by the law. Furthermore, respondent, on December 30, 1954, prior to the time the first return here involved was filed, issued interim regulations prescribing how the election should be made. T.D. 6118, 1955-1 C.B. 698, 717, par. 14. No substantial compliance with filing requirements and no special notice or special circumstances are alleged, and certainly none are evident from this record. Hence the authorities cited by petitioners on this point are inapplicable. The partnership having failed to elect to aggregate its separate operating mineral interests must compute percentage depletion for the periods here involved on the basis that each quarry was a separate property under section 613. Overhead and other expenses not allocated in the partnership books should be allocated among the quarries on the basis of sales for the purpose of computing the net income limitations. Issue 7 and 7(a). Depreciation and salvage value. Findings of Fact During the taxable periods in controversy, Bryan Rock owned over 300 pieces of depreciable property. These included many items of heavy equipment such as power *249 shovels, cranes, bulldozers and graders; lighter equipment such as trucks and compressors; and fixed assets such as buildings and structures. All were depreciated by the partnership on the straight-line basis. The estimated useful lives of the assets, and therefore the rates of depreciation, were determined by Bailey, who was experienced in the business generally and who was familiar with each asset and the use to which it was put in Bryan Rock's operations and with the partnership's purchases and sales of equipment. This determination was made in conjunction with the accountants who prepared the returns for the partnership. No salvage value was expressly taken into account in determining the rates of depreciation; however because of the excellent maintenance and repair policy of the partnership, the depreciable property of the partnership was customarily used until the end of its physical life. This was taken into consideration by Bailey and the accountants in determining the useful lives of the equipment, and the useful lives used by the partnership in depreciating its equipment generally exceeded the useful lives of comparable equipment used in the construction industry as set forth *250 in the depreciation guideline Bulletin F issued by respondent. Bryan Rock seldom sold any of its depreciable assets until their physical lives were exhausted. The cost of moving or dismantling most of the heavy equipment was more than its value as scrap and often these pieces were not even sold as scrap. Most of the rest of the equipment was sold as junk or scrap and the partnership included the price received therefor in ordinary income. During the period here involved, the partnership sold only one piece of equipment at a gain and it reported an overall net capital loss on the sale of equipment during the period. The basis for depreciation used by the partnership, for assets acquired prior to May 1, 1952, was the fair market value thereof as determined in an appraisal of the partnership assets made by Heidenreich at the time the corporation was liquidated in 1952, and this has been accepted by respondent. Heidenreich also made an appraisal of the partnership assets as of August 1, 1957. During the interval between the two appraisals the cost of the type of equipment used by the partnership, new, increased steadily. Allowing for this inflation in price during the period, the market *251 value of the partnership assets as of August 1, 1957, as determined by Heidenreich, was less than their book value on the partnership books. In computing the corrected partnership net income in the notice of deficiency, respondent accepted the rate of depreciation used by the partnership on its returns, but set up salvage values ranging from 10 to 20 per cent of cost on all items of equipment acquired by the partnership after its fiscal year ending January 31, 1954. By amended answer respondent claimed an increased deficiency by setting up salvage values on equipment acquired by the partnership prior to January 31, 1954, thereby reducing the allowable depreciation during the period here involved. On brief respondent concedes error in the salvage values used in the notice of deficiency and claims that salvage value equal to the junk value of the assets should have been used. Respondent claims this is 4.8 per cent of the original basis of these assets on the partnership's books. By amended petitions petitioners challenged the salvage values determined by respondent and also alleged that in computing depreciation the partnership was entitled to use the shorter useful lives for comparable *252 equipment set forth in Bulletin F and in court decisions in other cases. The depreciation rates used by the partnership in computing depreciation on its returns were correct. Opinion As is true with regard to other issues, the pleadings herein and concessions on brief present a shift of positions. The principal question remaining however is whether petitioners have proved shorter useful lives for Bryan Rock equipment than those lives which represented the judgment of experienced management when the returns were filed. We think this must be answered in the negative. The contemporaneous estimates of useful lives are, in our opinion, closer to accuracy than those represented by the construction industry classification in Bulletin F or the theoretical approach advanced by petitioners that because the appraised value of the partnership assets on hand as of August 1, 1957, after making allowance for inflation, was less than the book value of the assets as reflected on the partnership books at that time the useful lives used by the partnership in computing depreciation on its books and returns were too long. At best even if we accept the appraised values and the amount of inflation claimed *253 by petitioners, the latter argument would indicate only that the partnership had underestimated its overall depreciation. It would give us no basis for determining the proper rate of depreciation on any individual asset. Furthermore, Bulletin F merely represents average experience in various designated industries and the partnership is not entitled to use the average asset lives set forth therein for comparable equipment unless its own experience with such equipment is inadequate to permit it to determine the probable period over which such assets would be useful to it in its trade or business. Sec. 1.167(a)-1(b), Income Tax Regs. Petitioners have not justified their application of Bulletin F on the basis of inadequacy of the partnership's experience with the equipment it used. From Massey Motors v. United States, 364 U.S. 92 (1960), and Hertz Corp. v. United States, 364 U.S. 122 (1960), it is clear that depreciation rates are to be computed on the basis of the useful life of the asset in the taxpayer's business, based upon estimates during the taxable years to be derived from the taxpayer's experience and applied on a uniform basis. Bulletin F is not to be applied in any case as *254 a matter of law. The Massey Motors case also makes it clear that the basis for depreciation is to be adjusted for estimated salvage value at the termination of the useful life of an asset. We recognize that under normal circumstances the partnership would be required to set up some salvage value, probably junk or scrap value, as an adjustment to its basis for depreciation. Wright Contracting Co., 36 T.C. 620 (1961), affd. 316 F. 2d 249 (C.A. 5, 1963). However, we can see no practical or reasonable need or reason for doing so in this particular case under the circumstances here present. It is our understanding that the partnership assets were reappraised shortly after Mary's death and the assets were then transferred to a corporation, which corporation was sold to unrelated interests within a few years thereafter. The useful lives used for depreciation purposes for the partnership were longer than the average useful lives used for equipment subjected to the harsh usage given it by the partnership. Whether or not it was done consciously and expressly, we believe the rates of depreciation used made allowance for a built-in salvage value, as evidenced by the fact that petitioners made *255 very few sales of equipment as such and the majority of those sales were made at a loss. It is true that some of the equipment, after its physical life as equipment had been exhausted, was sold as junk or scrap. However, petitioners reported the sales price of junk or scrap as ordinary income and consequently gained no tax advantage by not setting up salvage values. To require the partnership at this late date to set up estimated scrap value as salvage value for all of its assets, which at best would have to be based on numerous assumptions for which we have no evidentiary basis, including the average selling price of scrap metal at various places and at various times throughout this period, would necessitate recomputing all of the partnership tax returns, not only changing the depreciation schedules but also in all likelihood eliminating all ordinary income reported from scrap sales and reducing the gain or increasing the loss reported on sales of equipment as such. We do not think the experience of this company or the record here presented justifies such a requirement. We feel this is a good situation in which respondent's policy, announced in Rev. Rul. 90, 1953-1 C.B. 43, and Rev. Rul. 91, 1953-1 C.B. 44, *256 not to disturb claimed depreciation deductions unless there is a clear and convincing basis for a change, should be applied. In this regard we think the circumstances here differ from those present in Wright Contracting Co., supra.We have found as a fact that for the period here involved the rates for depreciation used by the partnership in computing depreciation were correct and we further conclude the partnership should not be required to adjust its basis for depreciation by estimated salvage values. Decisions will be entered under Rule 50. Footnotes
*. By official order of the Tax Court dated July 18, 1963 and signed by Judge Drennen↩, the figure 192,669.49 was deleted and 192,669.46 was substituted therefor.
1. Because of the complexities of this case, the interrelationship of the issues between the partnership and the various taxpayers, the numerous amendments to the pleadings raising new and additional issues, and the at times different approaches of the parties to the various issues on brief, it is difficult to determine whether we have met all the issues raised in this proceeding. However, we believe the above-itemized issues, which are stated in somewhat general terms, will include all issues raised and not agreed upon, except those about which there should be no dispute after the above issues have been decided.↩
2. We believe this opinion will be more readable if the specific findings of fact with respect to each issue are set out separately, followed by the opinion on that issue.
3. All returns here involved were filed in this office.↩
4. Presumably because the assets of both estates consisted primarily of James' and Mary's respective interests in the business and because the business required most of the cash available to it, the actual agreement entered into as of July 31, 1957, between the executors of the two estates and the newly formed corporation provided for payment by the corporation of its nonnegotiable 10-year notes in the amount of the liabilities of each estate with voting and nonvoting stock to be issued in exchange for the balance of the appraised value of the net business assets pursuant to the above formula.↩
5. This was apparently a typographical error. The allegations in the complaint would support a finding only that Davis was entitled to 8 percent of the partnership property.↩
6. For example, the fiduciary income tax return for James' estate for its fiscal year 1955 reported income from the limited partnership in the amount of $98,794.79 and other income totaling $651.27; it claimed deductions for interest, State property and income taxes, legal fees, administration expenses, and contributions totaling $42,719.16, a dividend exclusion of $45, and an exemption of $600, and reported taxable income of $54,869.39, on which it paid tax. Schedule A attached to respondent's notice of deficiency started with the latter figure, and added to it $53,171.24, being one-half of the additional partnership income as computed on Schedule B. 7. These theories would appear to produce a greater deficiency in Docket No. 87900 than determined in the notice of deficiency. See Fn. 6. The pleadings do not appear to cover such an increased deficiency. In Docket No. 87901 respondent included only Mary's one-half of the partnership income in the income of her estate for the period July 10, 1957, through June 30, 1958. Thus the only issues in that case are the adjustments to partnership income.↩
8. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
9. Statutory provisions for filing an executor's final accounting would apparently not be applicable to James' executor if its duties in that capacity necessitated a longer period than that prescribed. In re Wachovia Bank & Trust Co., 210 N.C. 385, 186 S.E. 510 (1936); cf. Doub v. Harper, 234 N.C. 14, 65 S.E. 2d 309↩ (1951).
10. Under the terms of James' will Mary was authorized to determine the final disposition of the partnership business.
11. This is the language used in the notice of deficiency. This treatment points up an inequity in respondent's approach to these cases. In the estate tax case he treats as an asset of Mary's estate the entire amount of the limited partner's share of the partnership income, unreduced by any income tax required to have been paid thereon. It is obvious that either Mary or James' estate must pay income tax on the limited partner's share of the taxable income of the partnership. Either this item or other items in Mary's estate would be reduced to the extent thereof.↩
12. The actual difference was $45,041.42. ↩
13. There is a duplication in the amount of $9,435.90 in the cost of labor capitalized by respondent under this issue and under the preoperating expense issue, which respondent concedes should be eliminated from one issue or the other.↩
1. This is the amount which respondent says is duplicated in Issue 3.↩
14. SEC. 616. DEVELOPMENT EXPENDITURES. (a) In General. - Except as provided in subsection (b), there shall be allowed as a deduction in computing taxable income all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well) if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed. This section shall not apply to expenditures for the acquisition or improvement of property of a character which is subject to the allowance for depreciation provided in section 167, but allowances for depreciation shall be considered, for purposes of this section, as expenditures.↩
15. Per respondent's Exhibit RR and brief.↩
16. It appears to us that this issue should have been settled by the parties who had before them all the necessary information and could have determined the proper treatment for both the expenditure and the recovery.↩
1. By official order of the Tax Court dated July 18, 1963 and signed by Judge Drennen, the original footnote references were deleted and the present one substituted therefor.
*↩Royalties. 17. There would appear to be some discrepancy between the evidence presented in this case with respect to the separateness of the quarry operations and the evidence presented to this Court in the prior case of Estate of James E. Bryan, 34 T.C. 501 (1960), affd. 290 F. 2d 807 (C.A. 4, 1961), on which this Court based its findings that insofar as practical all the quarries were operated as a single unit.
18. We would think the pendency of this litigation would have alerted the petitioners to the requirement for filing an election had they wanted to bring this issue clearly into focus.↩